UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JUSTIN COX,<br><br>                Plaintiff,<br>    v.<br><br>FIRST STUDENT INC.,<br><br>                Defendant. | CASE NO. 3:25-cv-05497-DGE<br><br>ORDER ON MOTION TO COMPEL<br>ARBITRATION (DKT. NO. 9) |

This matter comes before the court on Defendant First Student Inc.'s motion to compel arbitration.  (Dkt. No. 9.)  For the reasons that follow, Defendant's motion is GRANTED.

## I       FACTUAL AND PROCEDURAL BACKGROUND

### A.  Plaintiff's Employment

On May 14, 2025, Plaintiff Justin Cox filed a lawsuit against Defendant in Pierce County Superior Court.  (Dkt. No. 1-2.)  Plaintiff worked for Defendant for nearly ten years, and on June 1, 2023, he was offered a promotion "in the form of a new position as an Area General Manager."  (*Id.* at 2.)  Plaintiff alleges the offer letter did not state that his promotion was

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 1

conditional upon his agreement to the terms of a noncompetition agreement, nor did the letter state that Plaintiff would be subject to a noncompetition agreement upon acceptance of the new position.  (*Id.* at 3.)  Plaintiff accepted the job on June 22, 2023, and "entered into a contractual employment agreement" with Defendant.[1]  (*Id.*)

Plaintiff alleges that from this time forward, he repeatedly notified his supervisors of "significant maintenance and safety issues present in several buses used in the West Linn and McMinnville areas of greater Portland."  (*Id.* at 3–5.)  Plaintiff grew frustrated with the "lack of response or meaningful follow-up" regarding his safety concerns and alleges that on March 14, 2025, he sent a letter to his supervisors sharing these frustrations.  (*Id.* at 5.)  The letter reads in relevant part,

> In light of these persistent challenges and my deep desire for genuine improvement, I am formally requesting to be released from my non-compete clause to explore opportunities that align more closely with the support and accountability we talk about at First Student.  I want to emphasize that this request is not motivated by salary or promotional aspirations.  My satisfaction with my current role would be complete if our teams received the support they deserve and if those responsible for providing this support were held accountable.
> . . .
>
> I am fully prepared to finalize all outstanding tasks, including contract amendments and negotiations, to ensure that I leave my responsibilities in order and without further burdening my team or our operations.

(*Id.* at 6, 41.)  Plaintiff states that he had not contacted any other potential employers and "only intended to push [Defendant] to provide him with adequate support[.]"  (*Id.* at 6.)  According to Plaintiff, his supervisor Kim Worster scheduled a call following receipt of this letter, during which Plaintiff shared he was "'[i]n no way'" entertaining working at a competing company.

---

[1] The employment agreement mentioned by Plaintiff contains an arbitration agreement (Dkt. No. 1-2 at 36–37) and other restrictive covenants (*id.* at 32–35).  Plaintiff largely glosses over this fact in his complaint but attached the employment contract as an exhibit.  (*See id.* at 27–39.)

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 2

(*Id.* at 6–7.)  When asked if there was anything Defendant could do to prevent him from requesting release from the noncompete agreement, Plaintiff said there was nothing Defendant could do to fix things.  (*Id.* at 7.)   Plaintiff personally reached out to Chief Operating Officer Dean Surhe to request a release from the noncompetition agreement.  (*Id.*)  He then attended a conference in Los Angeles with other Area General Managers on March 20 and 21, 2025.  (*Id.*)

Upon his return from the conference, Plaintiff alleges he "continued his work with [Defendant], as planned." (*Id.* at 8.)  On March 24, 2025, Plaintiff was called to a meeting with Worster and Katy Powers, the Regional Human Resources Manager.  (*Id.*)  Worster apparently told Plaintiff that because he was "'looking to go to the competition, the company has made the decision to end your employment with immediate effect and enforce your non-compete.'"  (*Id.*)  Plaintiff alleges he was involuntarily terminated during this meeting.  (*Id.*)  He reached out to Powers with follow-up questions about his supposed termination; Powers responded and emphasized Plaintiff had resigned on March 14, 2025, when he sent the letter to his supervisors.  (*Id.* at 8–9.)  Plaintiff insists that the noncompete provision in his employment contract has prevented him from obtaining new employment and that he was wrongfully terminated from his position.[2]  (*Id.* at 10–11.)

**B.  Defendant's Ohio Lawsuit and the Motion to Compel Arbitration**

Defendant provides its version of events in its motion to compel.  (Dkt. No. 9.) Defendant emphasizes that when Plaintiff was promoted to Area General Manager, his employment agreement contained a valid and binding arbitration agreement:

---

[2] Plaintiff's concerns about the noncompete provision were apparently borne out in November 2025, when Defendant obtained a temporary restraining order against Plaintiff in Ohio state court that prevented him from working for a competitor company.  (*See* Dkt. Nos. 30; 32-1 at 2–3); Section I(C) *infra*.

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 3

**Article 13 — Mediation and Arbitration Requirement**

. . .

**(b) Arbitration.** If Mediation proves unsuccessful in resolving any Disputes, the Executive and First mutually consent to Arbitration. One arbitrator will be selected from a panel of five provided by the American Arbitration Association ("AAA"), with the non-demanding party making the first selection and, in the event of disagreement, the final selection. Arbitration will be according to the then applicable rules of AAA. Costs of the arbitrator will be paid by First, with each party paying the costs associated with its own respective legal representation.

. . .

**(e) Waiver of jury Trial/Exclusive Remedy.** Except for First's rights as set forth in Article 7, the Executive and First waive any constitutional or statutory right to have any dispute between them covered by the terms of this Agreement decided by a court of law and/or by a jury in a court.

**(f) Applicability.** The arbitration clause applies to claims and disputes regarding this Agreement, the employment relationship, wrongful termination, and alleged violation of state and federal laws regarding employment, including state and federal laws against discrimination or retaliation and all claims under the common law, and tort claims (excluding workers' compensation, unemployment insurance claims or state or federal disability insurance claims and claims under any other valid statute or law that expressly precludes arbitration of such claims).

(Dkt. Nos. 9 at 2–3; 1-2 at 36–37.) Under the agreement, Plaintiff was required to mediate, and if unsuccessful, arbitrate any claims arising out of the agreement or his employment with Defendant in Ohio, pursuant to Ohio law. (Dkt. No. 1-2 at 36–38.)

Defendant's perspective on the events is that Plaintiff unequivocally resigned on March 14, 2025. According to Defendant, in the meeting on March 24, Plaintiff's resignation was accepted and his request to be relieved from the noncompetition agreement was denied. (Dkt. No. 9 at 4.) Following his resignation, Plaintiff delayed returning his company laptops and "actively reached out" to other employees of Defendant to obtain an "encrypted, secured flash drive," which prompted a forensic review of Plaintiff's equipment after he returned it. (*Id.*) The review apparently revealed Plaintiff transferred "over 790MB of data" from his company laptops

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 4

to an external hard drive the same day he sent his resignation letter.  (*Id.* at 5.)  It also revealed that in the months leading up to his resignation, Plaintiff was searching for employment with Defendant's competitors and conducting internet searches to learn both how to avoid his non-compete agreement and how to collect unemployment benefits.  (*Id.*)

Defendant then filed a complaint in Hamilton County, Ohio Court of Common Pleas to "protect against Plaintiff's use and disclosure of [Defendant]'s confidential information and trade secrets."  (*Id.*; *see also* Dkt. No. 10-1 at 3–15.)  In its complaint, Defendant stated it was not waiving its right to arbitrate and invoked Article 7(e) of the employment agreement, which is titled "Restrictive Covenants" and states in relevant part:

> Without limiting the right of First to pursue all other legal and equitable remedies available for violation by the Executive of the covenants contained in this Article 7, it is expressly agreed by the Executive and First that other remedies cannot fully compensate First for any violation by the Executive of the covenants contained in this Article 7 and that First shall be entitled to injunctive relief without the necessity of proving actual monetary loss, to prevent any such violation or any continuing violation thereof.

(Dkt. No. 9 at 5; *see also* Dkt. No. 10-1 at 25.)  On May 13, 2025, the state court granted Defendant's request for temporary injunctive relief and Plaintiff was enjoined from "further misuse and misappropriation" of Defendant's confidential information.  (Dkt. Nos. 9 at 5; 10-2 at 2–3.)  The following day, Plaintiff filed his lawsuit in Pierce County Superior Court.  (Dkt. No. 1-2.)  He brings claims under Washington law for (1) breach of contract; (2) retaliation; (3) hostile work environment; (4) wrongful termination in violation of public policy; (5) unenforceable non-compete clause under Washington Revised Code § 49.62.020; (6) failure to provide a requested personnel file under Washington Revised Code § 49.12.250; and (7) wage withholding under Washington Revised Code § 49.52.050.  (*Id.* at 11–19.)

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 5

Defendant removed the action to federal court on June 4, 2025, on the basis of diversity, because Defendant is a citizen of Delaware and Ohio, and Plaintiff is a citizen of Washington. (Dkt. No. 1 at 2–3.)  The parties initially agreed to mediate and stipulated to a motion to extend the deadline for Defendant's responsive pleading (*see* Dkt. Nos. 5, 6); the mediation was apparently unsuccessful, and on September 9, 2025, Defendant filed a motion to compel arbitration.  (Dkt. No. 9.)

### C.  Defendant's Second TRO and the Noncompete Agreement

While the motion to compel arbitration was pending, on November 21, 2025, Plaintiff moved for an "emergency motion for preliminary injunction" requesting this Court enjoin Defendant from enforcing the noncompete agreement against him.  (Dkt. No. 30.)  Defendant had apparently filed, and was granted, a temporary restraining order ("TRO") against Plaintiff in Ohio state court on November 17, 2025.  (*Id.* at 1–2; *see also* Dkt. No. 32-1 at 2–3.)  Based on the state court's ruling, Plaintiff was enjoined from starting work for his new employer (a competitor of Defendant) until a final determination on the injunction.  (Dkt. Nos. 30 at 2; 31 at 2–3.)  Plaintiff's position was that Washington Revised Code § 49.62.050 requires his noncompete agreement to be adjudicated in Washington; therefore, the noncompete agreement, and Defendant's efforts in Ohio to enforce it, were "per se in violation of this statute, and void." (Dkt. No. 30 at 6.)  The Court construed Plaintiff's filing as a motion for TRO and ordered Defendant to respond within 48 hours.  (Dkt. No. 34.)  On November 24, 2025, the Court ordered the Parties to submit supplemental briefing on whether the Court has the authority to bifurcate Plaintiff's claims by sending some to arbitration but retaining others.  (Dkt. No. 37.)

The Court ultimately concluded that it could not grant Plaintiff's requested injunction because doing so would violate the Anti-Injunction Act.  (Dkt. No. 41.)  It dispensed of

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 6

Plaintiff's assertions that § 49.62.050 was a jurisdiction-stripping statute and that the statute granted this Court exclusive jurisdiction over Plaintiff's noncompete agreement.  (*Id.* at 2–6.) The questions regarding the enforceability of the noncompete agreement in arbitration and whether the Court could (or should) bifurcate the noncompete claim from the remainder of Plaintiff's claims remained pending and are addressed in this order.

**D.  The Parties' Arguments**

Defendant seeks to enforce the arbitration agreement for several reasons.  It argues the agreement is valid and enforceable and that all of Plaintiff's claims are covered by the agreement, because employment-related claims are explicitly included in the arbitration provision. (Dkt. No. 9 at 8–10.)  Defendant also argues it did not waive its right to arbitrate when it initiated its lawsuit in Ohio, because it was acting to protect itself from immediate harm pursuant to Article 13(a) of the employment agreement[3] and has not otherwise acted inconsistently with its intent to arbitrate.  (*Id.* at 10–12.)

Plaintiff disagrees and argues in response that Defendant did in fact waive the right to arbitrate by filing a "retaliatory" lawsuit in Ohio which waived the arbitration agreement per the plain terms of the employment contract.  (Dkt. No. 21 at 7–10.)  Plaintiff also advances the argument that he is exempt from arbitration under the Federal Arbitration Act because by the terms of his employment, he is engaged in interstate commerce.  (*Id.* at 10–13.)  Finally, Plaintiff argues the arbitration agreement is unconscionable because its enforcement would prevent him from bringing certain claims that only exist under Washington law and would conflict with Washington public policy.  (*Id.* at 13–15.)

---

[3] Article 13(a) includes the language, "Should any conduct of the Executive present an *immediate threat of harm* to First, First may forego the requirements of this Article and pursue the matter in court."  (Dkt. No. 1-2 at 36) (emphasis added).

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 7

As for the Parties' supplemental briefing, Defendant reasserts that an arbitrator can decide the enforceability of Plaintiff's noncompete agreement. (Dkt. No. 45 at 2–4.) It draws a distinction between the *enforceability* of the Ohio choice of law provision (as applied to Plaintiff's noncompete agreement) and the *arbitrability* of Plaintiff's claims as a whole. (*Id.* at 2.) According to Defendant, even if the Ohio choice of law provision is found void and unenforceable, it would not void the entire noncompete clause and would instead simply mean that Ohio law does not apply to Plaintiff's noncompete claim. (*Id.* at 4.)

Plaintiff restates his argument that § 49.62.050 makes the entire arbitration agreement void and adds that a decision that arbitration must occur in Washington would make Plaintiff "*de jure* and *de facto* the prevailing party, and entitled to attorney's fees and actual damages as required under Washington law." (Dkt. No. 44 at 1–2 (citing Wash. Rev. Code § 49.62.080(3).) Additionally, Plaintiff renews his argument that Defendant has waived its right to invoke the arbitration agreement after suing Plaintiff in Ohio state court a second time. (*Id.* at 6–7.)

The Parties agree that the Court has authority to bifurcate Plaintiff's claims. (*See* Dkt. Nos. 44 at 2–6; 45 at 1.) Plaintiff favors this approach but emphasizes that bifurcation should only occur if the Court were to order his remaining claims be arbitrated in Washington rather than Ohio. (Dkt. No. 44 at 4–6.)

## II    DISCUSSION

### A. Legal Standard

The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2; *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015). The FAA also applies to employment contracts. *Brennan*, 796 F.3d at 1129; *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001). In considering a motion to compel arbitration,

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 8

the "court's role under the [FAA] . . . is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).[4]  These gateway issues, however, "can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably* provide otherwise.'"  *Brennan*, 796 F.3d at 1130 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).  The party seeking to compel arbitration under the FAA bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate.  *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

In ruling on a motion to compel arbitration, courts apply the "summary judgment standard" outlined in Federal Rule of Civil Procedure 56.  *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).  At this stage, a party does not "necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements" under Rule 56.  *Block v. City of L.A.*, 253 F.3d 410, 419 (9th Cir. 2001).  An affidavit or declaration must be made "on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

---

[4] Section 4 of the FAA provides a judicial remedy where a party seeks to compel arbitration.  *See* 9 U.S.C. § 4.  Under Section 4, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties[]" for an order compelling arbitration. *Id*.

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 9

**B. Choice of Law**

"Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011). Accordingly, when deciding whether the parties agreed to arbitrate a certain claim (including arbitrability itself), courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so.") (citation omitted). Likewise, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements[.]" *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). "Any doubts about the scope of arbitrable issues, including applicable contract defenses, are to be resolved in favor of arbitration." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1022 (9th Cir. 2016).

A federal court sitting in diversity, as in this case, looks to the law of the forum state when making a choice of law determination. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). In Washington, courts generally enforce contract choice of law provisions, with certain exceptions. *McKee v. AT & T Corp.*, 191 P.3d 845, 851 (Wash. 2008). Washington courts will disregard the choice of law provision in a contract and apply Washington law if "without the provision, Washington law would apply; if the chosen state's law violates a fundamental public policy of Washington; and if Washington's interest in the determination of the issue materially outweighs the chosen state's interest." *Id.* A choice of law provision will be enforced unless all three of these conditions are met. *Id.*

Here, the employment agreement states it is governed by and construed according to Ohio law.[5] (Dkt. No. 1-2 at 38.)  Plaintiff appears to concede this point in his complaint (*see id.* at 17); likewise, he states in his response to Defendant's motion to compel arbitration that Ohio law applies.  (Dkt. No. 21 at 13.)  However, in the course of the briefing related to Plaintiff's motion for TRO (Dkt. No. 30) and supplemental briefing (Dkt. Nos. 37, 44, 45), Plaintiff clarified his belief that Washington Revised Code § 49.62.050 makes the arbitration clause void because it requires him to adjudicate his claims in Ohio—in apparent conflict with Washington public policy.  (Dkt. No. 44 at 1–2.)

### 1.  Severability

The employment agreement contains a severability clause.  (*See* Dkt. No. 1-2 at 38.)  It provides:

> If any provision of this Agreement or the application thereof to anyone, or under, any circumstances, is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.  If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held invalid, unenforceable or otherwise illegal, the provision so held to be invalid, unenforceable or otherwise illegal will be reformed to the extent (and only to the extent) necessary to make it enforceable, valid or legal.

(*Id.*)

Because Plaintiff has raised the issue of whether Washington law prevents arbitration of his noncompete claim in Ohio, the Court will separately consider the provision of the noncompete clause that requires Plaintiff to adjudicate his noncompete claim pursuant to Ohio

---

[5] Article 20 reads, "This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio without regard to principle[s] of conflicts of law."  (Dkt. No. 1-2 at 38.)

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 11

law in its choice of law analysis. *See Walters v. A.A.A. Waterproofing, Inc.*, 211 P.3d 454, 462 (Wash. Ct. App. 2009) (citations omitted) ("When a court finds a provision in an employment arbitration agreement to be unconscionable, the court may enforce the remainder of the contract without the unconscionable clause"; this is "particularly likely" when the agreement includes a severability clause.).

### 2. Choice of Law: Unenforceable Noncompete Claim

All three conditions required to disregard the choice of law provision are met regarding Plaintiff's noncompete claim. First, if there were no choice of law provision in the employment agreement, Washington law would be applied to the contract. Since 1967, Washington courts have employed the "most significant relationship" test to contract choice of law issues where there is not a choice of law selected by the parties. *McKee*, 191 P.3d at 851–852 (citing Restatement (Second) of Conflict of Laws § 188 (1971); *Mulcahy v. Farmers Ins. Co.*, 95 P.3d 313, 317 (2004)). In conducting the test, courts weigh the "relative importance" of "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance of the contract, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties" to the particular issue. *Mulcahy*, 95 P.3d at 317 (citation omitted). Here, Washington is the place of contracting, the place of negotiation of the contract, the place of performance of the contract, the location of the subject matter of the contract, and the domicile and residence of Plaintiff. Defendant's ties to Washington are that it does business in the state and as a result, employs Washington residents such as Plaintiff. The Court must look to the law of Washington in making this determination, *see Nguyen*, 763 F.3d at 1175, and concludes that if there were no choice of law provision in the Parties' contract, Washington law would apply.

Second, Ohio law, which permits noncompete provisions in broad circumstances, conflicts with Washington's targeted interest in protecting Washington-based employees from adjudicating noncompete claims in a foreign jurisdiction pursuant to the choice of law principles or substantive law of the foreign jurisdiction. *Compare Lake Land Emp. Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 30 (Ohio 2004) ("this court has long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions") *with* Wash. Rev. Code § 49.62.050 ("A provision in a noncompetition covenant signed by an employee who is Washington-based is *void and unenforceable*" if it requires the employee to "adjudicate a noncompetition covenant outside of this state" or if it allows or requires the "*application of choice of law principles or the substantive law of any jurisdiction other than Washington state*.") (emphasis added). A fundamental policy may be "embodied in a statute which makes one or more kinds of contracts illegal," or one which is "designed to protect a person against the oppressive use of superior bargaining power." Restatement (Second) of Conflict of Laws § 187(2)(b) cmt. g.

The focus of the inquiry here is whether Ohio law permitting a reasonable noncompete agreement that imposes restrictions on the employee is contrary to a Washington fundamental public policy. To be clear, Washington does not disallow all noncompete agreements. But application of Ohio law to Plaintiff's noncompete claim would likely permit adjudication and enforcement of the noncompete in Ohio as long as it was not geographically or temporally unreasonable, *see Lake Land*, 804 N.E.2d at 30, and Washington has declared a strong public policy in protecting Washington employees from adjudicating their noncompete agreements out-of-state. *See* Wash. Rev. Code § 49.62.050. At least one court in this district, also sitting in diversity, has found that § 49.62.050 "renders [the employer's] noncompete unenforceable

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 13

because it requires [the plaintiff] 'to adjudicate a noncompetition covenant outside of' Washington." *CVS Pharm. Inc. v. Brown*, Case No. C21-306 MJP, 2021 WL 977697, at *4 (W.D. Wash. Mar. 16, 2021). The Washington State House of Representatives Office of Program Research's Bill Analysis explained that § 49.62.050(3) was intended to make a noncompete covenant provision "void and unenforceable . . . to the extent it deprives the employee or independent contractor the protections or benefits of Washington's noncompete statutes." WASH. LAB. & WORKPLACE STANDARDS COMM., BILL ANALYSIS, SSB 5935, Reg. Sess., at 2 (2024). At a February 16, 2024, House Labor & Workplace Standards Committee meeting, Representative Liz Berry recommended reporting SB 5935 out of committee and stated the legislation was "intended to clarify the intent of" Washington's noncompete legislation passed a few years previously.[6] *Hearing on SB 5935 Before the H. Lab. & Com. Comm.*, 68th Leg., 2024 Reg. Sess. (Wash. 2024) (statement of Rep. Liz Berry, Chair, H. Lab. & Com. Comm.). The amendment was added to address "several interpretations in the court[s] that have not turned out the way they were intended"; Representative Berry stated "clarifying" the intent of the legislature was a "very important thing to do to make sure that we're protecting workers and making sure that we have fair competition in the state of Washington." *Id.*

By contrast, Ohio appears to take a more employer-friendly view of noncompete agreements, regardless of the impact on employees. As the Ohio Supreme Court explained, Ohio has "long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions." *Lake Land*, 804 N.E.2d at 30. These agreements do not violate public policy because they are "reasonably necessary for the

---

[6] SB 5935 addressed several amendments to Washington's noncompete laws, including the choice of law provision in § 49.62.050(3) at issue here. *See* BILL ANALYSIS, SSB 5935.

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 14

protection of the employer's business, and not unreasonably restrictive upon the rights of the employee." *Id.* (citation omitted). Put even more forcefully: "A covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect an employer's legitimate interests." *Id.* at 33 (quotations and alterations omitted) (affirming the law set forth in the syllabus of *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 544–545 (Ohio 1975)). Public policy considerations in Ohio case law regarding noncompete agreements are mostly restricted to fair competition, rather than protection of employees. *See UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1068, 1081 (Ohio Ct. App. 2001) (citing *Brentlinger Enter. v. Curran*, 752 N.E.2d 994, 1004 (Ohio Ct. App. 2001) ("The [public policy element from the *Raimonde* test] is primarily concerned with the public's interest in promoting fair business competition.").

The Washington Supreme Court has held that "'[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision.'" *Dix v. ICT Grp., Inc.*, 161 P.3d 1016, 1021 (Wash. 2007) (en banc) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). The Washington legislature announced an unmistakable interest in protecting its employees from other jurisdictions' choice of law rules and substantive law in enacting § 49.62.050(3). *See* BILL ANALYSIS, SSB 5935, at 2. Accordingly, the Court finds that Washington Revised Code § 49.62.050(3) is a "fundamental policy" as contemplated by *McKee* and the Restatement (Second) of Conflict of Laws § 187(2)(b). Enforcing the use of Ohio law in this instance conflicts with *Dix*'s holding and "contravene[s] [the] strong public policy" declared by Washington. 161 P.3d at 1021 (citation omitted).

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 15

Finally, Washington's specific interest in protecting its citizens from precisely this scenario—in which they are forced to adjudicate noncompete claims in a different jurisdiction and pursuant to another state's laws—"materially outweighs" Ohio's more limited interest in this matter. *McKee*, 191 P.3d at 852.  Once more, Washington has declared an unmistakable strong public policy in preventing Washington employees from being subjected to a foreign jurisdiction when adjudicating a noncompete claim whereas Ohio has only identified a more general interest in enforcing noncompete agreements.

Plaintiff argues that "[f]orcing this case into arbitration would conflict with Washington's public policy." (Dkt. No. 21 at 14.)  However, Washington courts are "generally loath to upset the terms of an agreement" and in situations "when parties have agreed to a severability clause in an arbitration agreement, courts often strike the offending unconscionable provisions to preserve the contract's essential term of arbitration." *Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 768 (Wash. 2004) (en banc).  Here, the Court is faced with only one unconscionable provision and both parties agree the provision requiring Plaintiff to adjudicate his noncompete claim pursuant to Ohio law in Ohio can be bifurcated from the remainder of the contract.  (Dkt. Nos. 44 at 2–6; 45 at 1); *Walters*, 211 P.3d at 462 (the unconscionable provisions are "easily severed" by omitting one phrase and two sentences that conflict with a controlling statute).  The Court will sever the unenforceable provision and enforce the remainder, which effectuates the Parties' intent. *Zuver*, 103 P.3d at 768 (noting that the parties "explicitly expressed their intent" for the court to sever the two unconscionable provisions by agreeing to a severance clause).  Therefore, pursuant to the terms of the severability clause, the Court will separate the choice of law provision from its general application to the noncompete clause and reform the choice of law provision "to the extent (and only to the extent) necessary to make [the noncompete agreement]

enforceable[]" within the context of Washington Revised Code § 49.62.050(3). (Dkt. No. 1-2 at 38.) Accordingly, the Ohio choice of law provision in the Parties' employment agreement is unenforceable *as applied to the arbitrability of Plaintiff's noncompete claim* and Washington law will be applied instead.

### 3.   Choice of Law: Remainder of Plaintiff's Claims

Though the Court has determined it will not enforce the forum selection clause as it pertains to Plaintiff's noncompete claim, it does not extend that conclusion to the remainder of Plaintiff's claims. As discussed, if there were no forum selection clause at play here, Washington law would apply to the Parties' contract via the "most significant relationship" test. *See McKee*, 191 P.3d at 851–852 (citations omitted). However, the analysis points toward honoring the Parties' forum selection clause on both elements two and three. The Parties do not identify, and the Court is not aware of, anything that indicates Ohio's treatment of the remainder of Plaintiff's claims is contrary to a fundamental public policy identified by Washington. And because Washington does not appear to have a particular interest in the determination of the remainder of Plaintiff's employment claims, the Court cannot conclude that Washington's interest in the matter "materially outweighs" Ohio's interest. *McKee*, 191 P.3d at 852. The Court therefore will enforce the Parties' selection of a forum for assessing the arbitrability of the remainder of Plaintiff's claims and will apply Ohio law.

### C.  Analysis

#### 1.  Arbitrability

The Court concludes the arbitration agreement is valid and enforceable as to all of Plaintiff's claims, notwithstanding Plaintiff's position that Washington Revised Code § 49.62.050 renders the entire arbitration agreement unenforceable. (*See* Dkt. Nos. 21 at 13–14;

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 17

44 at 1–2.)  Plaintiff fails to explain why the entire arbitration agreement is unenforceable if the choice of law provision as it applies to the noncompete claim is severed.

Ohio has expressed a strong policy favoring enforcement of arbitration clauses in written agreements.  *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 865 (Ohio 1998) (collecting cases).  Arbitration agreements are "valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract."  *Taylor Bldg. Corp. of Am. v. Benfield*, 884 N.E.2d 12, 19 (Ohio 2008) (citing Ohio Rev. Code § 2711.01(A)).  Washington likewise favors enforcing arbitration clauses in contracts.  *Saleemi v. Dr.'s Assocs., Inc.*, 292 P.3d 108, 111 (Wash. 2013) ("Under Washington law, an arbitration agreement 'is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of contract.'") (citing Wash. Rev. Code § 7.04A.060(1)).  Like any contract, a valid arbitration agreement requires mutual assent.  *Cabrera v. Charter Commc'ns, LLC*, 195 N.E.3d 533, 537–538 (Ohio Ct. App. 2022) (citation omitted) ("A valid arbitration agreement . . . requires an offer and acceptance that is supported by consideration and is premised on the parties' meeting of the minds as to the essential terms of the agreement."); *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 491 (Wash. 2020) (en banc) (citations omitted) (as with any contract, "'[i]t is essential to the formation of [an arbitration agreement] that the parties manifest to each other their mutual assent to the same bargain at the same time'").

The Parties did not initially dispute that the arbitration agreement included in Plaintiff's employment agreement was valid and enforceable under general contract provisions.  Plaintiff's original position appeared to be that because Ohio law is applied to the entire employment contract, it would be unconscionable to enforce the arbitration provision, because it "unconscionably prevents the effective vindication of [his] rights under Washington law" and

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 18

"would conflict with Washington's public policy." (Dkt. No. 21 at 13–14.)  He did not clarify this position until his motion for TRO, when he asserted that Washington Revised Code § 49.62.050 made the noncompete agreement and Defendant's efforts to enforce it "*per se* in violation of [§ 49.62.050] and void." (Dkt. No. 30 at 6.)  In his supplemental briefing, Plaintiff essentially rehashes this argument.  (*See* Dkt. No. 44 at 1–2) (arguing the arbitration agreement is unenforceable because it requires arbitration to occur pursuant to Ohio law, which is "*per se* void" under Washington Revised Code § 49.62.050).  Once more, Plaintiff does not explain *how* the choice of law provision, as applied to his noncompete claim, makes the Parties' entire agreement to arbitrate unenforceable.

A party challenging an arbitration provision as unconscionable "must show that the arbitration clause *itself* is unconscionable."  *Taylor Bldg.*, 884 N.E.2d at 21 (emphasis added); *see also McKee*, 191 P.3d at 856 ("when the validity of the arbitration agreement itself is at issue, the courts must first determine whether there was a valid agreement to arbitrate").  If the court determines the arbitration clause is enforceable, "claims of unconscionability that relate to the contract generally, rather than the arbitration clause specifically, are properly left to the arbitrator in the first instance."  *Taylor Bldg.*, 884 N.E.2d at 21.  Put another way, questions about which forum's law should be applied to the plaintiff's substantive claims cannot be resolved until the question of arbitrability is.  *Banks v. Jennings*, 920 N.E.2d 432, 435 (Ohio Ct. App. 2009) ("[o]nly when the [arbitration] provision is *found unenforceable* do questions of forum selection and choice of law arise because, absent arbitration, a court must resolve the dispute") (emphasis added).  The outcome is the same if the Court applies Washington law.  *See Heights at Issaquah Ridge, Owners Ass'n v. Burton Landscape Grp., Inc.*, 200 P.3d 254, 255 (Wash. Ct. App. 2009) ("Courts resolve the threshold legal question of arbitrability by examining

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 19

the arbitration agreement without inquiry into the merits of the disputes. If the dispute can fairly be said to invoke a claim covered by the agreement, any inquiry by the courts must end."). A court may "enforce an arbitration agreement in a contract that the arbitrator later finds to be void." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006).

Bearing all this in mind, the Court finds the arbitration agreement here is enforceable as to all of Plaintiff's claims. There is no dispute that Defendant offered Plaintiff a promotion to Area General Manager (*see* Dkt. No. 1-2 at 22–24), nor that Plaintiff accepted the offer when he agreed to be bound by its terms and began working. *E.g.*, *Mulvey v. GuideOne Mut. Ins. Co.*, 98 N.E.3d 926, 931 (Ohio Ct. App. 2017) ("[a]s with other contracts, the elements of such a unilateral employment contract include an offer, an acceptance, contractual capacity, consideration in the form of bargained-for benefit or detriment, a manifestation of mutual assent, and legality of purpose") (citation omitted); *Flower v. T.R.A. Indus.*, 111 P.3d 1192, 1199 (Wash. Ct. App. 2005) (citation omitted) ("[e]mployment contracts are governed by the same rules as other contracts"). And because both Plaintiff and Defendant agreed to arbitrate disputes arising out of the employment agreement, consideration for the contract was given. *Jones v. Carrols, LLC*, 119 N.E.3d 453, 464 (Ohio Ct. App. 2019) (citation omitted) (the Ohio Supreme Court has held that "giving up a right to trial . . . is consideration" and no consideration is required beyond "the mutual agreement to arbitrate"); *Zuver*, 103 P.3d at 766–767 (Washington courts hold that "mutuality of obligation" means "both parties are bound to perform the contract's terms[,]" including in the context of arbitration agreements).

The arbitration agreement is enforceable even when considering Plaintiff's noncompete claim in the context of Washington Revised Code § 49.62.050. The Court has already found that § 49.62.050 is not a jurisdiction-stripping statute requiring this Court to retain jurisdiction. (Dkt.

No. 41 at 5.)  As Defendant points out, several other statutes in the same chapter of the Washington code explicitly recognize an arbitrator's ability to substantively determine the enforceability of a noncompete agreement.  (*See* Dkt. No. 45 at 3) (citing Wash. Rev. Code § 49.62.020(2) ("A court or arbitrator must presume that an noncompetition covenant with a duration exceeding eighteen months after termination of employment is unreasonable and unenforceable . . . ."); Wash. Rev. Code § 49.62.080(3) ("If a court or arbitrator reforms, rewrites, modifies, or only partially enforces any noncompetition covenant, the party seeking enforcement must pay the aggrieved person the greater of his or her actual damages or a statutory penalty of five thousand dollars, plus reasonable attorneys' fees, expenses, and costs incurred in the proceeding.")).  The plain language of § 49.62.050 does not prohibit an arbitrator from rendering a decision that a noncompete provision is unenforceable, and Plaintiff has yet to cite to any authority supporting his position that it does.

The few cases analyzing § 49.62.050 have found that a noncompete clause that forced an employee to adjudicate their claims outside the state of Washington and pursuant to non-Washington law was indeed void, but importantly, those cases were procedurally distinct from this one: there was no question of arbitrability before the court and the analysis involved substantive choice of law.  *See CVS Pharm.*, 2021 WL 977697, at *4 (finding CVS's noncompete was unenforceable because it required the employee to adjudicate his noncompete outside Washington and denying CVS's motion for TRO); *Cynosure LLC v. Reveal Lasers LLC*, Case No. 22-11176-PBS, 2022 WL 18033055, at *13 (D. Mass. Nov. 9, 2022) (determining that while the lawsuit forced a former employee to litigate his claim outside of Washington, that "[did] not necessarily void the non-competition agreement" because the employment agreement did not require the employee "to litigate exclusively in Delaware or Massachusetts"; the court

contemplated a motion to sever the noncompete claim and transfer it to Washington). As discussed, questions of choice of law or forum selection do not arise until the question of arbitrability is resolved. *Banks*, 920 N.E.2d at 435; *Issaquah Ridge*, 200 P.3d at 255. And a court may still enforce arbitration agreements in contracts "the arbitrator later finds to be void." *Buckeye*, 546 U.S. at 448. As the Court has determined, the choice of law provision as it relates to Plaintiff's noncompete claim has been severed from the remainder of the employment contract. *See* Section I(B) *supra*. But the fact that Washington law applies to the determination of the *arbitrability* of Plaintiff's noncompete claim does not impact the finding that the arbitration agreement in general is *enforceable* as to all of Plaintiff's claims.

The analysis thus turns to whether Plaintiff's claims fall within the scope of the arbitration agreement. "[W]hether a cause of action is within the scope of an arbitration agreement may be determined by applying the federal standard" from *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386 (6th Cir. 2003). *Duff v. Christopher*, 233 N.E.3d 109, 116 (Ohio Ct. App. 2023) (citation omitted). *Fazio* provides that the proper method of analysis is to "ask if an action could be maintained without reference to the contract or relationship at issue." 340 F.3d at 395. If it can, the action likely falls outside the scope of the arbitration agreement. *Id.* Likewise, under Washington law, "'[i]f the dispute can fairly be said to invoke a claim covered by the [arbitration] agreement, any inquiry by the courts must end.'" *Issaquah Ridge*, 200 P.3d at 255.

Looking to the arbitration agreement at issue here, it is impossible that Plaintiff's lawsuit could be maintained without reference to either the employment agreement or the employment relationship between Plaintiff and Defendant. Plaintiff brings a claim for breach of the employment agreement itself (*see* Dkt. No. 1-2 at 11–13), as well as claims of retaliation, hostile work environment, wrongful termination, unenforceable noncompete clause, failure to provide

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 22

personnel file, and wage withholding (*id.* at 13–19).  All these claims require reference to the employment relationship between the parties.  Further, the plain language of the arbitration agreement indicates that Plaintiff's employment-related claims fall within its scope: "The arbitration clause applies to claims and disputes regarding this Agreement, *the employment relationship, wrongful termination and alleged violation of state and federal laws regarding employment,* including state and federal laws against discrimination or retaliation and all claims under the common law, and tort claims[.]" (Dkt. No. 1-2 at 37) (emphasis added).  Plaintiff does not challenge that his employment claims fall within the scope of the arbitration agreement; rather, he argues it would be unconscionable to apply Ohio law to his Washington claims and that Washington state law precludes arbitration of his noncompete claim.  (*See* Dkt. Nos. 21 at 13–17; 44.)  However, as the Court has discussed, that argument is unfounded.  At this stage, Plaintiff's lawsuit cannot not be maintained without referring to the employment contract or employment relationship, and therefore, Plaintiff's claims fall within the scope of the arbitration agreement.  *See Fazio*, 340 F.3d at 395.

Because the arbitration agreement is valid and enforceable, and because Plaintiff's claims fall within the scope of the agreement, Plaintiff's claims must proceed to arbitration.  *See Sprinkle v. Gen. Dynamics Land Sys.*, Case No. C09-1672Z, 2010 WL 1330328, at *3 (W.D. Wash. Mar. 30, 2010) (citing *Cir. City Stores*, 532 U.S. at 120) (where a valid employment contract exists, employment disputes are subject to mandatory arbitration pursuant to the FAA).  Plaintiff's noncompete claim must be arbitrated in Washington.  *See* Section II(B)(2) *supra*.  The remainder of Plaintiff's claims must be arbitrated in Ohio per the terms of the employment agreement.

## 2. Waiver

Like any other contractual right, the right to arbitrate may be waived. *Fravel v. Columbus Rehab. & Subacute Inst.*, 53 N.E.3d 953, 956 (Ohio Ct. App. 2015). However, a court will not "lightly infer" waiver of the right to arbitrate, and the party asserting waiver must prove that the waiving party both knew of the right to arbitrate and, "based on the totality of the circumstances, acted inconsistently with that right." *Id.*

Defendant's position is that it did not waive the right to arbitrate because the terms of the employment agreement gave Defendant the right to seek immediate relief if Plaintiff breached the noncompete agreement and stated in its first Ohio state court complaint that it was not waiving its right to proceed in arbitration. (Dkt. No. 9 at 10–12.) Plaintiff argues Defendant waived its right to arbitrate according to the "plain text" of Article 13 of the employment agreement when it sued him in Ohio. (Dkt. No. 21 at 7–10.) Plaintiff renewed his waiver argument in his supplemental briefing, arguing that Defendant "has continued to seek relief outside of the provenance of arbitration," including when it sought an injunction against Plaintiff in Ohio state court for the second time in November 2025. (Dkt. No. 44 at 6–7.)

There is no question Defendant knew of its right to arbitrate. Defendant drafted the employment agreement that contained the arbitration provision and cited to Articles 7(e) and 13 in its complaint in Ohio state court. (*See* Dkt. Nos. 9 at 5; 10-1 at 4 n.1, 9.) Thus, there is no basis for this Court to conclude that Defendant was ignorant to the existence of the arbitration agreement. *See Debois, Inc. v. Guy*, 161 N.E.3d 99, 105 (Ohio Ct. App. 2020) (citations omitted) ("[A] contracting party is presumed to know the reasonable import of the contents of a signed agreement, including the existence and scope of an arbitration clause.").

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 24

Because the question of waiver requires consideration of the totality of circumstances, "[w]hether a party waived its right to arbitrate is dependent on the facts of that particular case." *Id.* (citation omitted).  Factors to consider may include:

> (1) whether the party seeking arbitration invoked the jurisdiction of the trial court by filing a complaint, counterclaim, or third-party complaint without asking for a stay of proceedings; (2) the delay, if any, by the party seeking arbitration in requesting a stay of proceedings or an order compelling arbitration; (3) the extent to which the party seeking arbitration participated in the litigation, including the status of discovery, dispositive motions, and the trial date; and (4) any prejudice to the non-moving party due to the moving party's prior inconsistent actions.

*Id.* at 106 (citation omitted).

The Court concludes that based on the totality of the circumstances, Defendant did not act inconsistently with its right to arbitrate.

### a.   Invoking the jurisdiction of the trial court

First, the parties do not dispute that Defendant invoked the jurisdiction of the Ohio Court of Common Pleas when it initially filed suit against Plaintiff.  However, that lawsuit was filed for the narrow purposes enumerated in the employment contract that (1) allowed Defendant to pursue matters in court in the event Plaintiff's conduct presented an "immediate threat of harm" to Defendant (Dkt. No. 1-2 at 36); and (2) permitted Defendant to seek injunctive relief for violations of the noncompetition agreement, and that doing so did not "limit[] the right of [Defendant] to pursue all other legal and equitable remedies available" (*id.* at 34).

A party resisting waiver may not rely exclusively on the existence of anti-waiver language within an arbitration provision, but such a clause is "merely one factor" that must be considered within the totality of the circumstances.  *Debois*, 161 N.E.3d at 109 (citation omitted); *see also id.* at 110 (discussing that anti-waiver clauses do not "universally or automatically preclude a finding of waiver[]" and reinforcing that each court must determine

whether the right to arbitrate was waived "under the circumstances before it"). In this case, the Court agrees that the assertion of anti-waiver language in Defendant's Ohio complaint (*see* Dkt. No. 10-1 at 4 n.1), combined with the narrow purpose of the first lawsuit pursuant to Article 7(e) of the employment agreement, indicates that Defendant did not act inconsistently with its right to invoke the arbitration clause when it filed its first Ohio lawsuit.

This outcome is not changed by the second lawsuit in Ohio, in which Defendant sought to enforce the noncompete agreement against Plaintiff. (*See* Dkt. No. 32-1 at 2–3.) According to the Parties' contract, "[w]ithout limiting the right of [Defendant] to pursue all other legal and equitable remedies available . . . it is expressly agreed by [Plaintiff] and [Defendant] that other remedies cannot fully compensate [Defendant] for any violation by [Plaintiff] of the [restrictive covenants] and that [Defendant] shall be entitled to injunctive relief." (Dkt. No. 1-2 at 34.) Like the first lawsuit, Defendant's second lawsuit falls within this narrow carve-out for equitable relief and therefore does not indicate an inconsistency with the right to arbitrate.

### b. Delay in seeking stay

The next consideration is whether Defendant delayed seeking a stay of proceedings pending its motion to compel arbitration. Ohio courts have held that a roughly three-month delay is typically not sufficient to constitute a waiver of the right to arbitrate. *Fries v. Greg G. Wright & Sons, LLC*, 120 N.E.3d 426, 437–438 (Ohio Ct. App. 2018) (94-day delay insufficient to demonstrate waiver); *Harsco Corp. v. Crane Carrier Co.*, 701 N.E.2d 1040, 1047 (Ohio Ct. App. 1997) (three months insufficient); *Neel v. A. Perrino Constr., Inc.*, 113 N.E.3d 70, 80–81 (Ohio Ct. App. 2018) (same). In this case, 95 days elapsed between when Defendant removed this case and when it filed its motion to compel arbitration. (*See* Dkt. Nos. 1, 9.) And within this period, the parties sought to engage in settlement negotiations. (Dkt Nos. 5, 6.) Considering all

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 26

circumstances and analogous case law, the Court cannot say Defendant's delay weighs in favor of finding waiver.

### c. Participation in the litigation

Third, the Court must consider the extent to which Defendant participated in the litigation prior to moving to compel arbitration. Defendant removed this case on June 6, 2025. (Dkt. No. 1.) On June 12, the Court granted the parties' stipulated motion to extend the deadline for Defendant to file a responsive pleading, citing the parties' agreement to mediate the matter. (Dkt. No. 6.) Pursuant to the order, Defendant filed both its motion to compel arbitration and a corresponding motion to stay discovery pending the Court's decision on the motion to compel on September 9. (Dkt. Nos. 9, 11.) During the interim period, Plaintiff apparently served discovery requests on Defendant and the parties mediated and conferred unsuccessfully. (Dkt. Nos. 11 at 4, 6; 13 at 7; 10-4; 10-11 at 2–4.) As of the time this Court granted the stay (*see* Dkt. No. 20), Defendant's "participation in the litigation was relatively limited." *Neel*, 113 N.E.3d at 79; *see also Fries*, 120 N.E.3d at 438 (determining that a motion for extension of time to answer discovery requests, an additional pleading related to that issue, and a motion to stay discovery was "insufficient to demonstrate waiver of the right to arbitrate"); *Pinnacle Condos. Unit Owner's Ass'n v. 701 Lakeside, LLC*, Case No. 96554, 2011 WL 5118464, at *4 (Ohio Ct. App. Oct. 27, 2011) (no waiver when the "majority of activity" between when the lawsuit was filed and when the court referred the case to arbitration was litigating a TRO and preliminary injunction and participating in mediation). As this case has developed, Defendant's participation has remained limited. It responded to Plaintiff's TRO (Dkt. No. 36) and provided supplemental briefing in response to the Court's order to show cause (Dkt. No. 45) but has not moved the case forward of its own volition.

**d. Prejudice to Plaintiff**

Finally, the Court must assess whether there is prejudice to Plaintiff. Ohio courts consider "prejudice up to the point when the stay [is] sought." *Fries*, 120 N.E.3d at 438. Plaintiff makes no argument he was prejudiced by the passage of time between when he filed suit against Defendant and when Defendant requested a stay pending arbitration. (*See* Dkt. No. 21 at 7–10.) The Court can find none, considering that the parties stipulated to a motion for extension of time less than a month after Plaintiff filed suit, and that no discovery took place prior to the Court granting the stay. (*See* Dkt. Nos. 1-1; 5; 6; 10 at 2–4.) *Cf. Debois*, 161 N.E.3d at 108 (agreeing with the trial court that there was prejudice when the plaintiff company invoked the court's jurisdiction and then delayed seeking arbitration for five months, inducing the individual defendant to "file[] a pleading pro se, hire[] counsel, and assert[] a class action against" the company, as well as engage in some discovery). Although Plaintiff argued in his motion for TRO that the injunction caused him "immediate, ongoing, and clear harm" (Dkt. No. 30 at 7), the relevant inquiry looks only to circumstances *before* the stay. *Fries*, 120 N.E.3d at 438.

On this record, the Court cannot conclude that Defendant's actions were inconsistent with the right to arbitrate. Under the totality of the circumstances, Plaintiff has not met the "heavy burden of proving waiver of the right to arbitration[.]" *Griffith v. Linton*, 721 N.E.2d 146, 149 (Ohio Ct. App. 1998) (citation omitted).

**3. Interstate Commerce Exemption**

Finally, Plaintiff attempts to avoid arbitration by claiming he is exempt under the FAA's carve-out for employees engaged in interstate commerce. Section 1 of the FAA excludes from its coverage the "'contracts of employment of seamen, railroad employees, or any other class of

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 28

workers engaged in foreign or interstate commerce.'" *Cir. City Stores*, 532 U.S. at 109 (quoting 9 U.S.C. § 1).

The Supreme Court's holding in *Sw. Airlines Co. v. Saxon* requires courts to conduct a two-step analysis to determine whether the transportation worker exemption applies. 596 U.S. 450, 455 (2022). First, courts must define the class of workers to which the plaintiff belongs. *Id.* In defining the class, courts must focus on the "actual work that the members of the class, as a whole" carry out, rather than what the employer "does generally." *Id.* at 456. Then, courts must determine whether that class of workers is engaged in foreign or interstate commerce. *Id.*; *see also Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 861 (9th Cir. 2021) (citing *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020) (citation omitted)) ("The inquiry is "'not whether the *individual worker* actually engaged in interstate commerce, but whether *the class of workers to which the complaining worker belonged* engaged in interstate commerce.'"). Any worker qualifying for the exemption "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Saxon*, 596 U.S. at 458 (citation omitted). The party advancing the exception bears the burden of showing it applies. *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024).

Here, Plaintiff argues he falls within the § 1 exemption to the FAA because he "routinely coordinated and supervised the transfer of buses, drivers, and passengers across state borders[]" and "regularly arranged and oversaw the pickup and delivery of new and used buses from dealerships and other locations, ensuring vehicles were delivered across state lines to meet operational needs." (Dkt. No. 21 at 12; *see also* Dkt. No. 22 at 1–3.) These tasks, according to Plaintiff, place him "squarely within the infrastructure of interstate commerce." (Dkt. No. 21 at 12.) Defendant responds that Plaintiff cannot show that he is part of a class of workers that

frequently participates or engages in a channel of interstate commerce.  (Dkt. No. 23 at 3–8.)  The Court agrees with Defendant.

As to the first *Saxon* prong, neither party has attempted to define the class of workers containing Plaintiff.  *Cf. Carr v. Traffic Mgmt., Inc.*, Case No. 2:24-cv-01333 HDV JCx, 2024 WL 4329070, at *3 (C.D. Cal. Aug. 13, 2024) (citing to the parties' declarations to describe the plaintiff's class of traffic controllers who were responsible for "'placing, maintaining, and removing traffic control operations' relating to, almost-exclusively, intra-state roads").  In support of its motion to compel arbitration, Defendant offers a declaration of Greg Newman, a Regional Vice President for Defendant, who states that "[n]one of the home-to-school routes in Plaintiff's region cross state borders[,]" but that "approximately five times per year, a school bus or charter bus in Plaintiff's region will cross state lines."  (Dkt. No. 24 at 2.)  Newman estimates that given the "limited number of bus routes that cross state lines per year . . . Plaintiff spent less than 1% of his time engaging in" interstate travel each year, and that in these situations, Plaintiff's role is limited to "management decisions, such as approval of the price for the trip."[7]  (*Id.*)  For his part, Plaintiff generally describes his *individual* job duties in his opposition to the motion to compel and accompanying declaration but does not identify a class of workers he is part of, nor does he present evidence that contradicts Defendant's characterization of his work.  (*See* Dkt. Nos. 21 at 10–13; 22 at 2–3.)  The parties' descriptions of Plaintiff's job emphasize

[7] Newman's declaration also includes an official job description outlining the major responsibilities for Plaintiff's role as Area General Manager.  (Dkt. No. 24 at 5–7.)  However, the *Saxon* inquiry requires courts to look at the work the plaintiff *actually performed*; how an employer "technically classifies" a plaintiff's job "is not dispositive."  *See Rubio-Leon v. Fresh Harvest, Inc.*, Case No. 24-cv-03375-EKL, 2025 WL 2653640, at *5 (N.D. Cal. Sept. 16, 2025) (citing *Saxon*, 596 U.S. at 456) (determining that a company's declaration that only addressed the work the plaintiffs were hired to do as "farm workers," rather than the work they actually performed, did not contradict the plaintiffs' evidence describing their actual work as truck drivers).

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 30

different aspects of his responsibilities, but regarding the broader class to which Plaintiff might belong, they do not submit conflicting evidence.  On this record, then, the best answer is that Plaintiff belonged to a class of workers engaged in oversight and day-to-day management of school transportation services for school districts in a specific region.

Notwithstanding, the Court is not convinced that Plaintiff is part of a class of workers that is engaged in interstate commerce.  A class of workers is only engaged in interstate commerce if it is "directly involved in transporting goods across state or international borders[]"; work that is only "'perceptibly connected to instrumentalities' of interstate commerce [is] not enough." *Saxon*, 596 U.S. at 451, 462 (citation and alterations omitted).  Workers who transport people (rather than physical goods) in the stream of interstate commerce may be exempt, but still must fall within the "narrow construction" of § 1.  *See Capriole*, 7 F.4th at 861 (discussing § 1 in the context of rideshare drivers).  Here, the evidence compels the Court's conclusion that Plaintiff's work is primarily local and intrastate in nature, and that the interstate movement of people or goods is not a central part of his class's job duties.  Although Plaintiff may have sometimes been involved in the transportation of people across state lines, Defendant's business is generally confined to providing "school transportation services to school districts throughout the United States," and "[n]one of the home-to-school routes in Plaintiff's region cross state borders." (Dkt. No. 24 at 1–2.)  Further, the evidence available to the Court indicates that the interstate travel in the "greater Portland, Oregon area" (*see* Dkt. No. 22 at 1) likely involved trips back and forth to Washington across the Columbia River.  As the Ninth Circuit held in the rideshare context, "'[i]nterstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers.'"  *Capriole*, 7 F.4th at 864 (agreeing

with and citing to the district court in *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 916 (N. D. Cal. 2020)).  That same principle is applicable here.

Defendant also points out that even when engaged in arguably interstate activities, Plaintiff's role in such activities was limited to management decisions and high-level oversight. (*See* Dkt. No. 24 at 2.)  Indeed, Plaintiff declared that he had "direct oversight and control" over transportation operations, including "[a]rranging and coordinating interstate travel," "directly facilitating the transportation of instrumentalities of commerce (buses) across borders," and "[d]eveloping and review[ing] student transportation routes."  (Dkt. No. 22 at 1–2.)  While it is true that § 1 does not require that the worker themselves cross state lines, the worker must be "so closely related to interstate and foreign commerce as to be in practical effect part of it." *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 911 (9th Cir. 2020) (citation and alterations omitted).

The Court is persuaded by the decision in *Wilson v. Get It Now, LLC*, where the district court determined the § 1 exemption did not apply to a regional manager of several locations of household-goods retail stores within a geographic area, because the "interstate character of some unidentified portion of the stores' transactions" did not change the "central duties" of the plaintiff.  Case No. 25-cv-1067 (ECT/DTS), 2025 WL 2304686, at *5 (D. Minn. Aug. 11, 2025). Otherwise, the result "would seem at odds with the Supreme Court's characterization of the exemption as 'narrow.'" *Id.* (citing *Circuit City Stores*, 532 U.S. at 118).  Similarly here, Plaintiff does not (and likely cannot) point to any evidence that Area General Managers employed by Defendant are sufficiently engaged in "a single, unbroken stream of interstate commerce that renders interstate travel a 'central part' of [the] . . . job description[,]" even if they sometimes do oversee interstate functions.  *Capriole*, 7 F.4th at 866.  At best, Plaintiff's work as

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 32

an Area General Manager was only "perceptibly connected" to the instrumentalities of interstate commerce. *Saxon*, 596 U.S. at 462 (citation omitted). This is too attenuated to fall within the narrow scope of the § 1 exemption. Plaintiff's argument that he is exempt from arbitration under § 1 of the FAA thus fails.[8]

### III    CONCLUSION

Having considered Defendant's motion, Plaintiff's response, and the remainder of the record, the Court GRANTS Defendant's motion to compel arbitration. (Dkt. No. 9.)

However, having found that analyzing the arbitrability of Plaintiff's noncompete claim under Ohio law violated a fundamental public policy of Washington (*see* Section II(B)(2) *supra*), the Court SEVERS Plaintiff's noncompete claim and COMPELS it to arbitration in Washington. All other terms of the arbitration agreement (*see* Dkt. No. 1-2 at 37–38) SHALL apply to the proceedings in Washington. The remainder of Plaintiff's claims SHALL be compelled to arbitration in Ohio pursuant to the terms of the arbitration agreement.

This case is STAYED and administratively closed. The parties SHALL move to dismiss or to reopen the case within 30 days of the completion of arbitration.

---

[8] Plaintiff raised the issue of attorney fees and damages based on reformation of the noncompete agreement. (*See* Dkt. No. 44 at 2) (citing Wash. Rev. Code § 49.62.080(3)). However, it is an open question whether the Court has reformed the noncompete agreement within the meaning of the statute as compared to modifying the application of the contract choice of law provision to the noncompete agreement. Accordingly, the Court offers no comment as to the applicability of § 49.62.080(3) and leaves it for adjudication before the respective Washington and Ohio arbitrators.

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 33

Dated this 24th day of February 2026.

David G. Estudillo
United States District Judge

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 9) - 34